Argued and submitted September 9, 1982, Court of Appeals reversed, circuit court affirmed January 18, 1983

STATE OF OREGON,
*Petitioner on review,*

*v.*

GLORIA VILLAGRAN,
*Respondent on review.*

(No. A20520, SC 28581)

657 P2d 1223

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Jeffrey Pugh, of Neuner, Dole, Caley & Kolbert, Roseburg, argued the cause and filed a response for respondent on review.

PETERSON, J.

** Appeal from Circuit Court for Douglas County. Robert M. Stults, Judge. 56 Or App 281, 641 P2d 1152 (1982).

## PETERSON, J.

Pursuant to a search warrant, police officers searched certain property on Cal Henry Road in Umpqua for evidence relating to a large scale marijuana production operation that had been uncovered in Lookingglass. As a result of that search, defendant was arrested and indicted for possession of a controlled substance, ORS 475.992. Defendant moved to suppress evidence seized pursuant to the warranted search contending that the affidavit in support of the warrant was insufficient to establish probable cause to search the property.[1] The motion was denied and defendant was found guilty. Her only assignment of error on appeal is the denial of her suppression motion and the only issue before us is whether the affidavit is sufficient to support the issuance of a search warrant.

The affidavit[2] states that the affiant, a police officer named Michael Noles, believed that evidence of a

---

[1] The defendant has throughout these proceedings relied solely upon the decisional law discussed below. She did, however, generally cite Or Const, Art I, § 9, and U.S. Const, Amend IV, in her motion to suppress. The Oregon statutes relating to search and seizure, which have not been cited by either party, appear at ORS 133.525 *et seq.*

Or Const, Art I, § 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment to the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] In the Affidavit for Search Warrant, the affiant, a police officer with the Douglas County Sheriff's Office, stated:

"(2) That I have reason to believe and do so believe that Nora Villagren *[sic]* and Norman Lee Waterbury, has property, to wit: Marijuana, Western molded fiber plant boxes, PVC pipe, wood siding nails, 'El Toro' steer manure, Dayton Blower Model 2C979, black vinyl electrical tape, white electrical wire, black electrical wire, manila rope, bags of 'Canada' peat moss, Simpson 1 1/4″ and 2″ white pipe and receipts, invoices, cancelled checks and ledger books regarding purchase and payment for the above which is now being concealed and on the premises known as the property located on a driveway adjacent to the Cal Henry driveway and residence located at 1054 Cal Henry

crime was located at the Cal Henry Road property because: Earlier that morning, pursuant to a search warrant, he had searched property in Lookingglass and discovered over a ton of marijuana growing in a large barn. A house and trailer located on the property were virtually empty. Cardboard boxes found on the property were labeled "B&N Greenhouse Supply, 2575 Whistler's Park Road, Roseburg, Oregon," leading Noles to conclude that they had previously been sent to that address. Noles then checked records in the county assessor's office and learned that the Lookingglass property was owned by one Nora Villagran (defendant's sister). He also checked with the Oregon and California Departments of Motor Vehicles and learned that

---

Road and including trailer with a barn behind it, both to the left side of the driveway and an an 'underground' house further down the driveway located in Umpqua, Douglas County, Oregon * * *.

"(3) That my belief is based on the following facts:

That this morning I helped serve a search warrant on property located just west of Lookingglass at which time we discovered over a ton of marijuana growing in a barn located on that property. Located on the property was a house and a trailer which I helped search and which were discovered to be vacant with virtually no furniture in either structure. * * * A complete list of property taken from the property adjoining the barns and from the barns is attached hereto as Exhibit 2.

Item #1 on Exhibit 2 mentions that the 4 cardboard boxes had been sent to 'B&N' Greenhouse Supply, 2575 Whistler's Park Road, Roseburg, Oregon.

That on September 29, 1979, I met with George Marsh in the Douglas County Assessor's Office and went through his records with him. We determined that the owner of the property above mentioned where the items found in Exhibit 2 is Nora Villagran. I checked Nora Villagran through teletype with the Oregon Motor Vehicles Division and discovered that her last known address is 2575 Whistler's Park Road.

That on September 29, 1979, I ran checks with the California and Oregon Departments of Motor Vehicles and learned that Norman Lee Waterbury has a current valid Oregon license with an address of 2575 Whistler's Park Rd., Roseburg, Oregon.

That on September 29, 1979, George Marsh, who lives near the property searched told me that a person named Ernie Madsen had built the barn wherein a large portion of the items in Exhibit 2 were located. I spoke with Larry Frost of the Sheriff's Office today and he told me that he had spoken with Madsen on September 29, 1979, and was told by Madsen that he had built the barn for a person named Norman Waterbury. Frost also told me that Madsen said the guy he built the barn for was building an 'underground' house in Umpqua which is described as being on the driveway adjacent to the driveway for the Cal Henry residence which is located at 1054 Cal Henry Road. Going up the driveway to the 'underground' house, to the left of the driveway is a trailer house and a barn behind said trailer. The 'underground' residence is located further down the driveway."

Nora Villagran and one Norman Lee Waterbury both listed their current addresses as 2575 Whistler's Park Road, Roseburg.

George Marsh, who worked at the assessor's office and lived near the Lookingglass property, told Noles that one Ernie Madsen had built the barn in which the marijuana was found. Noles then talked with a man named Larry Frost "of the sheriff's office" who said he had talked with Madsen earlier that day and that Madsen said that he had built the barn for Norman Waterbury and that Waterbury was building a house on Cal Henry Road in Umpqua. Madsen had then given Frost a detailed description of the Cal Henry Road property's location and layout. Based on this information, warrants were issued to search both the Whistler's Park and the Cal Henry Road properties for evidence relating to the Lookingglass marijuana production operation.

■　Defendant does not contend that the facts in the affidavit are false. She argues instead that they are insufficient to have justified issuance of the warrant. Our function, when faced with such an argument, is to determine whether a neutral and detached magistrate could conclude, based on the facts and circumstances shown by the affidavit, that there was probable cause to believe that the search would discover things specified in the affidavit in the places requested to be searched. *See* ORS 133.555(1), (2). We are to construe the supporting affidavit in a commonsense and realistic fashion. *State v. Tacker,* 241 Or 597, 601, 407 P2d 851 (1965), quoting from *United States v. Ventresca,* 380 US 102, 108, 85 S Ct 741, 13 L Ed 2d 684 (1965).

■　In determining whether an affidavit is sufficient to support a search warrant, a magistrate must decide (1) whether there is reason to believe that the facts stated are true, and (2) whether the facts and circumstances disclosed by the affidavit, if true, are sufficient to establish probable cause to justify the search requested. Defendant first contends that there is insufficient reason to believe that Madsen's information was true, specifically that "the affidavit fails to show the basis of [Madsen's] knowledge or his reliability." Second, she argues that the facts, even if true, do not give rise to a probable cause finding because "the

affidavit does not contain facts sufficient to create a well warranted suspicion that the place sought to be searched contained any evidence of any criminal activities." We conclude that both arguments lack merit and that the issuance of the search warrant was proper.

Defendant first argues that since the only facts connecting the Cal Henry Road property to the Lookingglass investigation were unsworn hearsay statements from Madsen and since the affidavit contained no facts regarding his veracity, the affidavit is insufficient under the Supreme Court's *Aguilar/Spinelli* [3] test. In short, defendant contends that there was an inadequate basis for believing Madsen's information.

Everyone who gives information to the police is an "informant" in the classic dictionary sense—one who informs or communicates information. In considering the reliability and veracity of persons furnishing information to the police, the connection of the person to the crime itself or to the criminal world is relevant. At the one extreme is the participant in the criminal activity who, for a variety of reasons, decides to become an "informer" in the second dictionary sense—one who informs against another, often for money or for other reward or gain. Then there is the person who, though not a party to the crime, is closely connected with the criminal establishment. A third category would include witnesses, including victims. A fourth category would include other persons unconnected with the crime who provide information, the significance of which the provider may or may not be aware. Courts have held that persons in the latter two categories may be more worthy of belief than an informant from the criminal establishment. *See State v. Montigue,* 288 Or 359, 605 P2d

---

[3] *Spinelli v. United States,* 393 US 410, 89 S Ct 584, 21 L Ed 2d 637 (1969); *Aguilar v. Texas,* 378 US 108, 84 S Ct 1509, 12 L Ed 2d 723 (1964). Both cases were decided under the Fourth Amendment to the United States Constitution and involved the sufficiency of search warrant affidavits that contained hearsay information provided by unnamed informants. We have restated the *Aguilar/Spinelli* test as requiring that such affidavits set forth: (1) the basis of the informant's knowledge, and (2) facts showing the informant's "veracity," *i.e.,* that he is credible or that his information is reliable. *State v. Montigue,* 288 Or 359, 362, 605 P2d 656 (1980). *See generally* ORS 133.545(3); 1 LaFave, Search and Seizure § 3.3 (1978); Moylan, *Hearsay and Probable Cause: An Aguilar and Spinelli Primer,* 25 Mercer L Rev 741 (1974).

656 (1980); *United States v. Harris,* 403 US 573, 91 S Ct 2075, 29 L Ed 2d 723 (1971). Identification of the informant by name may also be a factor to consider.

The premise which underlies the *Aguilar/Spinelli* holdings is that if reliance upon bald conclusions from anonymous informants is countenanced, the independent probable cause review by a neutral magistrate promised by the Warrant Clause will be transformed into a rubberstamp of police warrant requests. A further concern is that information obtained from unnamed sources within the criminal milieu is inherently suspicious. *See Spinelli v. United States,* 393 US 410, 415-16, 89 S Ct 584, 21 L Ed 2d 637 (1969). Accordingly, a body of federal caselaw has developed which requires an affiant relying upon tips from anonymous informants to set forth with some particularity the basis for the informant's knowledge and why the affiant believes the informant reliable and credible so that the magistrate will be able to decide independently whether the informant is truthful and the information is accurate. 1 LaFave, Search and Seizure § 3.3 (1978).

In *State v. Montigue, supra,* we noted that a number of courts have held that where the information is from a citizen informer named in the affidavit the need for the affiant to vouch for the informer's veracity is obviated. 288 Or at 364-365. We nonetheless declined to hold there that naming of a citizen informer is sufficient of itself to make the informer and his information presumptively credible. *See* the separate opinions of Linde and Lent, JJ., 288 Or at 368, 371. We viewed the fact that the informer there was named as but a "factor" in determining his veracity. 288 Or at 365. The main opinion then went on to note that since the informer was subject to criminal prosecution for giving a "false report" (ORS 162.375) or to civil liability for malicious prosecution if his information turned out to be false, the magistrate was justified in relying on his information.[4]

---

[4] *Montigue* was followed by *State v. Carlile, et al.,* 290 Or 161, 619 P2d 1280 (1980), which, though also involving named informers, is not directly pertinent here. In *Carlile,* the informers were involved in narcotics activities and while confessing provided the information that was used in the affidavits. The state contended that the informers' statements constituted "declarations against penal

The latter aspect of the *Montigue* holding engendered the disparate separate opinions. Given the facts here, however, it is not necessary to return to that affray. Madsen was not complicit and his information did not accuse Waterbury of a crime or even implicate him in one; in essence, Madsen merely indicated where Waterbury's property might be found. Thus, potential criminal or civil liability cannot be used to support his statements. Since the mere naming of Madsen is not sufficient here, other indicia of veracity are necessary.

■  There is nothing in the affidavit which directly establishes Madsen's veracity. Other than reciting his information, the affidavit says nothing about him. His veracity would have to inhere in the circumstances of the inquiry, the nature of his response, or other facts which tend to verify his statements. Thus we are confronted directly with the question of whether a disinterested named citizen, unconnected with the crime being investigated, should be deemed worthy of belief when questioned by police about background information regarding a suspect. Or should the police be required to establish the person's veracity or independently verify the information prior to relying upon it in an affidavit for a search warrant?

■  On the face of the affidavit, Madsen appears to be a wholly disinterested citizen providing information to the police at their request. There is no indication that he had any complicity in the criminal conduct being investigated or that he was even aware that criminal conduct had occurred or was occurring. The affidavit suggests that he did not seek out the police to "finger" Waterbury, but rather disclosed his information after being called by the police. Although Madsen's statements were once-removed hearsay, the statements were not incriminatory in the sense of accusing anyone of criminal activity. Madsen merely supplied a factual link connecting Waterbury to the Cal

interest" which, under *Montigue,* made them *per se* trustworthy. We refused to extend *Montigue* so far and upheld the affidavits only insofar as the information had been independently corroborated. 290 Or at 167-68. The fact that the informers in *Carlile* were complicit in the crime being investigated distinguishes it from both *Montigue* and this case.

Henry Road property. Finally, Madsen was apparently speaking from personal knowledge, and his information was subject to independent verification.[5]

Under the circumstances disclosed by the affidavit, it is reasonable to conclude that his knowledge was obtained in the course of working for or with Waterbury on the barn, and that Madsen was credible and that his information was accurate. Moreover, it was obtained at police request rather than volunteered. Unlike the *Aguilar/ Spinelli* anonymous informant cases or those such as *Montigue* where the informer is fingering someone and there is no independent ground for believing the story, here there is no reason for viewing the informer's information with suspicion or caution. Madsen's information, in a sense, verifies itself. Reasonable persons routinely rely upon factual information obtained in a manner such as this. One could naturally and not unreasonably conclude from the information that Waterbury had arranged for the barn to be built by Madsen and that Waterbury was building a house on Cal Henry Road and might be living there. Accordingly, we hold that the affidavit was sufficient to establish the truth of Madsen's statements.

Defendant's other contention is that even if Madsen's information can be viewed as accurate and reliable, the facts stated in the affidavit are insufficient to support a finding of probable cause to justify the search of the Cal Henry Road property. She argues that the facts indicated that the Whistler's Park Road residence was a more promising place to search and that Waterbury's connection with the Cal Henry property was too tenuous to justify a search there.

The Court of Appeals majority agreed with defendant:

"In determining if an affidavit demonstrates that evidence will be found in a particular place, we have utilized

---

[5] Defendant has not argued otherwise. Madsen's statement concerning the barn was corroborated by the person at the assessor's office and it is permissible to infer that he had direct knowledge that Waterbury was building the Cal Henry Road house. Moreover, the affidavit contained Madsen's detailed description of the Cal Henry Road property's location and layout, information capable of independent verification.

the 'most promising place' rule. Essentially, that rule is that probable cause to believe that certain evidence is at a particular location is established when it is shown that, under the circumstances, the designated location is the most promising place to look for the evidence. *State v. Skinner,* 5 Or App 259, 483 P2d 87, *rev den* (1971), *cert denied* 406 US 973 (1972); *see also Porter v. United States,* 335 F2d 602 (9th Cir 1964), *cert denied* 379 US 983 (1965); *State v. Johnson,* 34 Or App 73, 578 P2d 413, *rev den* 283 Or 235 (1978); *State v. Harris,* 25 Or App 71, 547 P2d 1394, *rev den* (1976).

"The affidavit in the present case shows that, if there was a 'most promising place' to look in this case, it was at the Whistler's Park property. * * * By contrast, there is nothing in this affidavit to suggest that the underground house 'being built' off Cal Henry Road is sufficiently far advanced in its construction to shelter anything, much less evidence of the sort sought here. The Cal Henry address was not, at least on the basis of this affidavit, a 'promising' place, much less a 'most promising' place." 56 Or App 281, 286, 641 P2d 1152 (1982).

This language suggests that where the police wish to search for evidence relating to a particular crime they must rank-order the potential search sites and, in order, obtain warrants and conduct searches starting with the "most promising" place and ending with those "less promising."

The relevant inquiry is whether the affiant has established probable cause to believe that particular evidence will be found in a particular location. ORS 133.555(2). The nature of "probable cause" is not such that if it is used to support a search at one location it is necessarily exhausted as to other potential search sites. Indeed, the circumstances of a case may give rise to probable cause to search several different locations at the same time, particularly where, as here, the evidence sought may be at once in more than one location.

This is illustrated by the very cases cited by the Court of Appeals majority. In each of the cases cited, the searches were upheld notwithstanding the fact that in each case the police had obtained warrants to search more than one location for the particular evidence. *See, State v. Villagran, supra,* 56 Or App at 288-90 (Richardson, J.,

dissenting).[6] We are aware of no case in which a court has struck down a search simply because there was a place where the sought-after evidence was more likely to be found. Accordingly, the fact that the Whistler's Park residence may have been a more likely place to find the evidence sought did not prevent the magistrate from concluding that there also existed probable cause to search the Cal Henry property for the same or similar evidence.[7]

---

[6] The term "most promising place" apparently originated in *Porter v. United States,* 335 F2d 602 (9th Cir 1964), *cert den* 379 US 983 (1965). A careful reading of the case discloses that it does not propound the "rule" the Court of Appeals cited it for. In *Porter,* a person robbed a bank while wearing a hat and coat. Soon thereafter, defendant was arrested for a traffic offense while driving an Oldsmobile. Although he was not wearing the hat and coat described by the teller, federal agents suspected that he was the bank robber. They applied for two search warrants to search for the hat and coat — one for the Oldsmobile and another for a Rambler also owned by the defendant. Defendant argued that inasmuch as the agents sought the same items in two different places that established that there was no probable cause to believe the evidence sought was in either. The court upheld the warrant stating that, given the circumstances, "[i]t would seem that the most promising place to look for these objects * * * would be in the automobile." 335 F2d at 604. The court then stated:

> "* * * As to the significance of the fact that two warrants were issued, one for the Oldsmobile and another for the Rambler, surely the fact that a suspect has two automobiles, or two residences, does not mean that neither one of them can be searched, because the suspect may have concealed the wanted evidence in the other one." 335 F2d at 605.

The "most promising place" language was thus not used to *limit* where the agents could search, but rather to support their decision to search the automobiles. *See also State v. Skinner,* 5 Or App 259, 483 P2d 87, *rev den* (1971), *cert den* 406 US 973 (1972) (search warrant for defendant's mobile home and automobile upheld).

[7] Recall that the police also obtained a search warrant for the Whistler's Park Road residence. Evidently, the Court of Appeals majority would have required the police to have executed that warrant as a prerequisite to obtaining one for the Cal Henry Road property. As the dissent below noted:

> "The rationale of the ["most promising place"] principle is not that the information in the affidavit must point to the single *most* promising place to the exclusion of all others. That would place an unnecessary risk on the warrant application process that a reviewing court would strike down the warrant because there was a more promising place for the evidence than that selected by the affiant. The basic rationale is that the affidavit must disclose a basis for reasonably concluding that the place sought to be searched is a promising place to find the evidence. That the issuing magistrate or the reviewing court may decide there was a more promising place to search does not mean there is not probable cause to believe the evidence is in the place the application for the warrant designates."

*State v. Villagran,* 56 Or App 281, 289, 641 P2d 1152 (1982) (Richardson, J., dissenting).

Reading the affidavit in a realistic and common-sense manner, we conclude that the affiant established probable cause for the requested search. The police had discovered a large, apparently sophisticated marijuana production operation. It was logical to conclude

— That either Villagran, the owner, or Waterbury, who arranged for the construction of the barn, or both, were connected with the illegal activity.

— That given the size of the operation, records existed pertaining to it.

— That because no records were found on the first search, that such records would be found either at the Whistler's Park Road property or at the Cal Henry Road property.

Even if the Whistler's Park residence was the more likely place to find evidence, Waterbury had also been connected to the Cal Henry property. Although the house there was apparently still under construction, Madsen had said that there was a house trailer and outbuildings on the property and it was reasonable to conclude that evidence might be located there. Given the scale and sophistication of the illicit activity and the evident exigencies resulting from the Lookingglass search, we cannot say that the magistrate erred in authorizing the search of the Cal Henry Road property.[8]

---

[8] This statement from 1 LaFave, Search and Seizure 486-89, § 3.2 (1978), is in point:

"Yet a third situation in which it is sometimes very important to determine whether probable cause means more-probable-than-not is when the issue is whether there is probable cause to search a particular place for evidence of crime. Probable cause to search, in contrast to probable cause to arrest, requires a probability determination with respect to certain specified items being in a particular place, and thus the most difficult question in such a case is likely to be whether there is a sufficient degree of probability vis-a-vis the particular car or apartment or whatever which is to be searched. Cases in which it will appear that there is not a 50% plus probability as to any one place arise in various ways, and perhaps do not all call for the same solution.

"One circumstance in which the problem arises is when the police have probable cause that a particular identified person has committed a crime and that he consequently is likely to have evidence of that crime in his possession *somewhere,* but they lack any information which makes one location (e.g., his car) a more likely location than another (e.g., his apartment). * * * To the extent such rulings permit searches to be made upon something less than a

The decision of the Court of Appeals is reversed and the judgment of the circuit court affirmed.

50% probability as to any one particular place, they do not appear objectionable. The fact remains that it is unlikely that the privacy of an innocent person will be disturbed under such circumstances.

"* * * * *.

"A second circumstance in which the probability-as-to-a-place problem arises is when the police have probable cause that several persons have together committed a certain crime as to which evidence is likely to be in the possession of *one* of the perpetrators, but the police lack any information making any one of them the most likely possessor at this particular time. * * * Here as well, it would seem that a fair compromise between privacy and law enforcement interests would permit a finding of probable cause with respect to a search of places in the possession of one or more of the probable confederates in the crime, even though it cannot be said that there is a 50% plus probability as to any single location. Once again there is no substantial danger that the privacy of an innocent person will be invaded." (Emphasis in original; footnotes omitted.)

See *United States v. McNally,* 473 F2d 934 (3d Cir 1973).