Argued and submitted February 17, at Patton Middle School, McMinnville, reversed and remanded June 15, petition for review allowed November 22, 2005

(339 Or 544)

STATE OF OREGON,
*Respondent,*

*v.*

LISA ANN HENDERSON,
*Appellant.*

20-02-01536B; A119000

113 P3d 944

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Wollheim and Ortega, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant, who was convicted of possession of a controlled substance, ORS 475.992, and two counts of endangering the welfare of a minor, ORS 163.575, appeals, assigning error to the denial of her motion to suppress evidence. She asserts, principally, that (1) the warrant authorizing the search of her home was not supported by probable cause; and (2) in all events, the officers' violation of ORS 133.575(3),[1] by failing to read the warrant to defendant before beginning their search, requires suppression. We agree with defendant's first argument. Consequently, we reverse and remand.

The material facts for purpose of our review under the applicable standard, *see Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), are undisputed. On November 7, 2001, Detective Carpenter of the Roseburg Police Department applied to the Lane County Circuit Court for a warrant to search, *inter alia*, defendant's residence in Springfield for a "5 diamonds band platinum band" and a "diamond solitaire gold ring," both of which were, allegedly, "[e]vidence of the crimes of [b]urglary and [t]heft."[2] In his supporting affidavit, Carpenter recounted that he and other Roseburg officers had been investigating a burglary and theft of two purses from a building in Roseburg.[3] In early November 2001, the officers interviewed several witnesses who identified a woman, McCorquodale, as having been in the area acting suspiciously at the time of the crime. One of the witnesses related that McCorquodale had attempted to sell some jewelry to another woman, Domenico. When the officers spoke with Domenico, she told them that she had bought a gold ring with a solitaire diamond from McCorquodale for $25 but later, after McCorquodale had told her "the ring is stolen," had

---

[1] ORS 133.575(3) provides, in part, that "before undertaking any search or seizure pursuant to the warrant, the executing officer shall read and give a copy of the warrant to the person to be searched, or to the person in apparent control of the premises to be searched."

[2] Carpenter further identified the premises to be searched as including "outbuildings, travel trailers [and] tents" located within the curtilage of defendant's property, as well as vehicles that were registered to, or under the control of, defendant.

[3] The affidavit did not identify the date of the theft.

returned the ring to McCorquodale. According to Domenico, McCorquodale had been trying to sell other rings, including a platinum ring with five diamonds.[4]

Carpenter's affidavit further recounted that, based on the foregoing information, he had arrested McCorquodale on November 7, 2001. After being advised of her *Miranda* rights, McCorquodale then related the following information to Carpenter:

> "McCorquodale said that she gave two of the rings to [defendant]. McCorquodale told me that [defendant] lived in Springfield and she [McCorquodale] paid off a debt of some Methamphetamine that was purchased. McCorquodale said that she gave [defendant] the platinum ring that contained diamonds along with the diamond solitaire ring within the last three weeks."

There is no indication in Carpenter's affidavit that McCorquodale told him where the alleged transfer of the rings occurred.

McCorquodale also told Carpenter that she "would assist in the recovery of the property" and drove with Carpenter to Springfield, where she pointed out defendant's residence. Carpenter then confirmed, through vehicle registration and other records, that defendant and Jerome Shorey resided at that address.

Having recounted those facts, Carpenter, in his affidavit, then described his "background knowledge and experience," particularly in investigating burglaries and thefts. The following "knowledge and experience" averments by Carpenter are central to our assessment of probable cause, as described below:

> "I know from my training and experience in serving search warrants that oftentimes persons will convert stolen property to their own use and keep the property at their residence and in their vehicles.

> "I know from my training and experience that sometimes persons will bury stolen property in the soil near

---

[4] Domenico described two other rings to the police. Those rings, as well as the diamond solitaire and the platinum band with five diamonds, all matched the description of jewelry stolen during the burglary.

their residence in an effort to conceal it. I know from my training and experience that sometimes persons will keep stolen property in a travel trailer or outbuilding, on their property, for storage or concealment purposes.

"That I know from my training and experience that oftentimes persons will keep smaller stolen items on their person.

"Oftentimes persons will keep receipts, records, or paperwork showing the sale, trade, or loan of the stolen property on their person, in their vehicle, and at their residence.

"* * * * *

"In the search warrants that I have executed or assisted in the service of I have often found stolen property, evidence of burglaries, thefts, criminal mischief and forgeries on previously unidentified visitors or residents and/or in their vehicles. Based on this information it is my belief that if there are any previously unidentified residents or visitors present during the execution of the search warrant it is probable that there will be evidence pertinent to the investigation for which the search warrant is issued on their persons or in their vehicles. I have been at search warrants or told of instances during the execution of a search warrant where upon the awareness of the arrival of police those persons involved with controlled substances, burglaries, thefts[,] criminal mischief and forgeries hide the controlled substances on or about elderly persons or children."

Based on Carpenter's affidavit, on November 7, the circuit court issued a warrant authorizing the search of defendant's residence, outbuildings, travel trailers, vehicles, and curtilage properties for a diamond solitaire gold ring and a platinum band with five diamonds, as well as the seizure of those items.

Carpenter, at least four other Roseburg officers, and two Springfield officers executed the warrant later that same day. When the officers arrived, defendant was at home, in the living room, with her two small children and her younger brother. Upon entering the residence, Carpenter informed defendant that the police were searching for stolen property. Carpenter remained with defendant and the children in the living room while the other officers "scattered" throughout

the house to "secure[ ] the premises." Not long thereafter, while Carpenter was still with defendant in the living room, defendant overheard one of the officers say that he or she had found some "pipes"—one of which (as described more fully below) was of the sort used for smoking methamphetamine.

According to defendant, at the time she overheard that the police had discovered the pipes, Carpenter had not yet read her the warrant—or, at least, the portion of the warrant identifying the two rings as the items sought—and had not provided her with a copy of the warrant despite her request that he do so. The trial court did not render a finding that precisely addressed the relative timing of when the warrant was completely read and when the pipes were found. However, the trial court did find that "the search was contemporaneous with the reading of the search warrant."[5]

The pipes were discovered in a desk drawer in a part of the house that is a converted garage. One pipe appeared to contain marijuana residue, and the other was "consistent with a pipe that would be used for smoking methamphetamine, with burnt residue in it." After the glass pipes were discovered, and after Carpenter completed reading the warrant to defendant, defendant showed the officers where she kept the rings.

At some point, after the discovery of the glass pipes, defendant's domestic partner, Shorey, came home. One of the officers, Springfield detective Lewis, spoke with Shorey

---

[5] As support for that finding, the trial court relied on the following testimony by defendant on cross-examination:

"Q. One officer stayed with you and told you what the contents of the warrant was; is that right?

"A. Yeah.

"Q. And while that officer was with you, the other officers were conducting the search?

"A. They were conducting the search while they said they were securing the property, before I was ever read the warrant or told specifically what was in it.

"Q. Okay. One officer stayed with you and read you the warrant; is that right?

"A. Yeah.

"Q. The other officers conducted the search?

"A. Mm-hmm."

about the discovery of the pipes. Lewis indicated that he believed that there was methamphetamine hidden in the residence, and he told Shorey that either the police could apply for a search warrant to find it or Shorey "could just show [them] where it was located." Lewis also expressed his concern about the proximity of defendant and Shorey's young children to drug paraphernalia and intimated to Shorey that child protective services "could be involved."

Shorey then took Lewis to a metal shed on the property and told him that the methamphetamine was hidden in a well-concealed location inside the shed. Following Shorey's directions, the police found a small metal box, which contained about 30 grams of methamphetamine as well as scales and packaging materials.

Defendant was subsequently charged with, among other crimes, possession of a controlled substance and two counts of endangering the welfare of a minor.[6] Defendant moved to suppress all evidence obtained as a result of the search of her home and the metal shed. Defendant contended, principally, that (1) Carpenter's affidavit in support of the warrant application did not establish probable cause that the two stolen rings were on the described premises; (2) further, and alternatively, officers had executed the warrant in violation of ORS 133.575(3); and (3) the glass pipes and the items found in the shed must be suppressed as the products of impermissible exploitation of either (1) or (2) or both.

The trial court rejected defendant's challenge to "the four corners of the search warrant." However, with respect to defendant's second argument, based on the alleged violation of ORS 133.575(3), the court found that, because "the search was contemporaneous with the reading of the search warrant"—that is, because the reading of the warrant did not precede the execution of the warrant—"it is clear that there is a statutory violation." Nevertheless, the court concluded that, under the reasoning of *State v. Blasingame*, 127 Or App 382, 873 P2d 361, *rev den*, 319 Or 406 (1994), suppression

---

[6] Shorey was also charged with the same crimes.

was not required because, given the "close temporal relationship [of the reading of the warrant] to the search," "the violation was [not] so aggravated that it reaches constitutional dimensions." Defendant was subsequently convicted following a stipulated facts trial.

On appeal, defendant reiterates, albeit with substantial refinement, her arguments to the trial court. Because it is dispositive, we begin with whether Carpenter's affidavit established probable cause for the warranted search of defendant's residence.

In *State v. Wilson*, 178 Or App 163, 166-67, 35 P3d 1111 (2001), we summarized the principles that guide our review:

> "To be sufficient, an affidavit in support of a warrant must permit a conclusion by a neutral and detached magistrate that the items specified in the warrant will probably be found in a specified place to be searched. ORS 133.555(2)[.] The standard is one of probability, which requires more than a mere possibility, but less than a certainty[.] In testing an affidavit, a court is to construe it 'in a commonsense, nontechnical and realistic fashion looking at the facts recited and the reasonable inferences that can be drawn from those [facts].' *State v. Charlesworth/Parks*, 151 Or App 100, 116, 951 P2d 153 (1997), *rev den*, 327 Or 82 (1998). Because of the preference for warranted searches over those conducted without prior judicial authorization, doubtful cases are to be resolved by deferring to an issuing magistrate's determination of probable cause."

(Citations omitted.) *See also State v. Pelster/Boyer*, 172 Or App 596, 601, 21 P3d 106, *rev den*, 332 Or 632 (2001) ("probable cause" means that it is "more likely than not" that "the objects of the search will be found at the location to be searched"); *State v. Arana*, 165 Or App 454, 456, 998 P2d 688 (2000) ("probably" means "more probably than not[.]").

Defendant contends that, even assuming the accuracy of McCorquodale's account that she had conveyed the two rings to defendant to "pay off a debt for some methamphetamine,"[7] Carpenter's affidavit is fatally deficient in

---

[7] Defendant does not, on appeal, substantially dispute McCorquodale's veracity. Although defendant does refer in passing to appellate decisions discussing

either of two respects. First, defendant asserts, Carpenter's "knowledge and experience"-based averments concerning where stolen property may be found, *see* 200 Or App at 228-29, are so vague and generalized as to be meaningless. In defendant's view, the upshot of those averments is that stolen property may be found "literally anywhere—at a residence, in a vehicle, buried in the ground, in a travel trailer or outbuilding, on the property, or on one's person." Indeed, at oral argument, defendant's appellate counsel styled those averments as embodying a "Green Eggs & Ham approach to search warrant affidavits":

> "On the defendant in her home;
>
> "On the defendant near her home;
>
> "On a third party in their car—
>
> "There's no way for the magistrate to pick. It's just simply a menu that they get to choose, 'well maybe I'll take this, and possibly that.' It has to be more probable, and that's not what has happened in this case."

Second, defendant emphasizes the alleged "staleness" of McCorquodale's information regarding the transfer of the rings "in the last three weeks":

> "The affidavit provides absolutely no basis upon which a reasonable person would conclude that the property would more likely than not be found at defendant's home three weeks later. It is just as likely (if not more likely) that defendant would have disposed of the stolen rings rather than keep them."

Thus, defendant concludes, "[t]here is simply no evidence linking the rings to defendant's home other than the officer's speculation that the rings could be anywhere."

criminally involved informants, *see, e.g., State v. Carlile,* 290 Or 161, 619 P2d 1280 (1980), the facts that McCorquodale was a named informant, that her admissions about the ring transaction were against her penal interest, and that aspects of her account (*e.g.,* the location of defendant's residence) were independently corroborated, are significant indicia of her reliability. *See, e.g., State v. Payne,* 150 Or App 469, 473-74, 946 P2d 353 (1997), *rev den,* 326 Or 390 (1998) (criminally involved informant's reliability was sufficiently established where informant was named, informant's statements were against his penal interest, and those statements were partially, independently corroborated); *see generally Pelster / Boyer,* 172 Or App at 605-07 (addressing veracity of criminally involved informant).

The state counters that the rings were durable, not perishable—that is, that they "retain their value for generations"—and that they were the sort of property that defendant could easily convert to her own use by wearing them herself. Moreover, the state asserts that nothing in Carpenter's affidavit referred to any circumstance that would have prompted defendant to sell or otherwise dispose of the rings rather than retain them.

■ As we understand defendant's arguments, they dispute both the spatial and temporal facets of probable cause—that is, both the likelihood that the rings were *ever* at defendant's residence and the likelihood that, even if the rings had once been at defendant's residence, they would still be there when the search occurred. With respect to the spatial component, it is undisputed that Carpenter's affidavit does not refer to evidence that the rings were *ever* in defendant's residence; in particular, the affidavit does not recite that McCorquodale ever told the affiant that she had given defendant the rings at defendant's house. Rather, the affidavit's linkage of the rings to defendant's residence is inferential and entirely dependent on the sufficiency of Carpenter's uncontroverted averment, based on his training and experience, that "oftentimes persons will convert stolen property to their own use and keep the property at their residence and in their vehicles."

In assessing the sufficiency of Carpenter's averments in establishing a probable cause nexus between the stolen rings and defendant's residence, we are mindful that such "training and experience"-based expertise "is a permissible way to establish such a nexus." *State v. Goodman*, 328 Or 318, 328, 975 P2d 458 (1999). However,

> "[t]he weight to be given to such representations depends on the totality of the facts contained in the affidavit: 'We do not here suggest that an officer's expertise, unconnected to objective facts derived from other sources, will satisfy constitutional requirements.' "

*Wilson*, 178 Or App at 171 (quoting *Goodman*, 328 Or at 328).

The most striking aspect of Carpenter's affidavit is the sheer number of places that he averred that items such as

the stolen rings "sometimes," "oftentimes," or "probably" would be found, *i.e.*, "at their residence and in their vehicle," "in a travel trailer or outbuilding," "in the soil near their residence," "on their person," "on the[ ] persons or in the[ ] vehicles" of anyone present during the execution of the warrant, and "on or about elderly persons or children." As defense counsel noted, the *Green Eggs and Ham* analogy comes to mind—in particular, the "ANYWHERE" conclusion to that Dr. Seuss classic[8] seems a logical conclusion, as well, to the litany of the many possible locations mentioned in this warrant as likely locations for the stolen rings.

The warrant in this case authorized the seizure of two specific items: a five diamond platinum band and a diamond solitaire gold ring. It specified the place to be searched as defendant's residence, including curtilage properties and her vehicles. It did not authorize the search of defendant, of others present during the execution of the warrant, of any vehicles of persons present during the execution of the warrant, or of any elderly persons or children. Thus, the affidavit in support of the warrant suggested that the objects of the search were "probably" or "oftentimes" likely to be found in places *other than* those authorized by the warrant to be searched.

Nevertheless, probable cause to search in one location does not preclude a finding of probable cause to search in

---

[8] "I like green eggs and ham!

"I do! I like them, Sam-I-am!

"And I would eat them in a boat.

"And I would eat them with a goat...

"And I will eat them in the rain.

"And in the dark. And on a train.

"And in a car. And in a tree.

"They are so good, so good, you see!

"So I will eat them in a box.

"And I will eat them with a fox.

"And I will eat them in a house.

"And I will eat them with a mouse.

"And I will eat them here and there.

"Say! I will eat them ANYWHERE!"

Dr. Seuss, *Green Eggs and Ham* 59-61 (1960).

other locations for evidence of a crime. In particular, when numerous diverse items are sought, it follows that they might be sought in numerous diverse locations. In *State v. Villagran*, 294 Or 404, 413-14, 657 P2d 1223 (1983), the court cautioned:

> "The nature of 'probable cause' is not such that[,] if it is used to support a search at one location[,] it is necessarily exhausted as to other potential search sites. Indeed, the circumstances of a case may give rise to probable cause to search several different locations at the same time, particularly where, as here, the evidence sought may be at once in more than one location."

This case differs somewhat from cases in which the evidence to be seized is of a type that is likely to be found in numerous different locations, such as drug paraphernalia or evidence of a marijuana growing operation. *See, e.g., State v. Brown*, 109 Or App 636, 644, 820 P2d 878 (1991), *rev den*, 313 Or 210 (1992) (where affidavit established that it was common practice for manufacturers of methamphetamine to store the precursor chemicals in different locations, probable cause existed to search several structures). Here, in contrast, the two rings were necessarily either in one location together, or in two locations separately, but they could not be in more than two locations. While the naming of more than one or two locations where the rings are likely to be found is not, *per se*, a problem, *see Villagran*, 294 Or at 413-14, an indiscriminate listing of myriad locations where the rings *might* "sometimes," "oftentimes," or "probably" be found gives rise to the sort of "diffusion" concern we addressed in *State v. Yuen*, 182 Or App 387, 400, 49 P3d 819 (2002).

In *Yuen*, two separate residences were located near a small marijuana growing operation. A trail led from the growing area to one of the residences; the defendant resided in the other residence. *Id.* at 394-95. The state relied on *Villagran* for the proposition that probable cause could exist to search both residences. *Id.* at 399. We rejected that argument:

> "Although the state is correct that, under the right circumstances, probable cause can be established for two residences, we do not believe that the circumstances here

support the conclusion that there was probable cause to search both residences.

"* * * [W]here there are multiple residences nearby, the likelihood that one particular residence is connected to the marijuana is diffused and a stronger factual showing is required to demonstrate that one residence should be the target of the search. Similarly, a stronger factual showing is necessary to demonstrate the reason that both residences should be targets of the search. Here, the affidavit does not establish a sufficient connection between defendant and the marijuana garden or between [his residence] and the garden, nor does the affidavit establish a connection that links the two residences or their residents."

*Id.* at 399-400 (citation and footnote omitted).

Although factually much different, *Yuen* is instructive here. That is, where, as here, the affidavit in support of the warrant purports to establish the likelihood of finding discrete items at myriad and diverse locations—*viz.*, on defendant's person, on the persons of unknown individuals who may be at defendant's residence, in the vehicles of such unknown persons, and on the persons of children and elderly people—that diffusion of generic "likelihoods," based on the affiant's training and experience, requires some more particularized, case-specific corroboration. Thus, in these circumstances, we conclude, at least *some* factual showing is required, in addition to the affiant's training and experience, to demonstrate the likelihood that the items to be seized are at the location to be searched.

That conclusion is grounded in the circumstances of this case. That is, we note, particularly: (1) The affidavit does not disclose where McCorquodale had transferred the rings to defendant; that is, the affidavit does not disclose whether that transaction occurred in Roseburg, where the theft occurred, in Springfield at defendant's residence, or elsewhere. (2) The affidavit does not refer to any history of any suspicious activity at defendant's residence; specifically, there is no representation that defendant routinely distributed drugs, and received consideration for such transactions, at her residence. And (3) the affidavit does not indicate whether defendant routinely trafficked in stolen goods.

In sum, the affidavit is devoid of any information *specific to the case at hand* that would indicate why the rings *probably* would be found at the residence in question. Rather, the only case-specific facts recited in the affidavit are (1) defendant received the stolen rings from the informant, at some unknown location, as payment for a drug debt roughly three weeks before the warrant issued; and (2) defendant lives in her residence. Given those circumstances, Carpenter's generic representations cannot, by themselves, elevate generic *possibility* to particular *probability*. *Compare Wilson*, 178 Or App at 171-72 (where affidavit "described a single sale of an unknown quantity of methamphetamine that occurred at some undisclosed time at a location other than defendant's residence," officer's representation that persons who traffic in drugs "usually" have evidence of drug dealing in their residences, or their vehicles, or on their persons was insufficient to establish that evidence of drug-related crimes *"probably* would be found in defendants' residence" (emphasis in original)).

The state contends, nevertheless, that, even if the officers' initial entry pursuant to the warrant was unlawful, suppression is not required because (1) defendant did not adequately preserve an argument that the officers' discovery of the items in the shed was the product of impermissible exploitation of that prior illegality; and (2) in all events, Shorey's disclosure of the location of the methamphetamine and related items was consensual and was not, in fact, the product of any such exploitation. We reject both arguments without further discussion. *See State v. Hall*, 183 Or App 48, 60-61, 50 P3d 1258 (2002), *rev allowed*, 335 Or 195 (2003) (reiterating that " 'exploitation occurs when unlawful police conduct reveals information that focuses police attention on the defendant and prompts them either to seek the defendant's consent or to ask questions leading to consent' " (quoting *State v. Stanley*, 139 Or App 526, 535, 912 P2d 948 (1996), *rev'd on other grounds*, 325 Or 239, 935 P2d 1202 (1997)).[9]

Reversed and remanded.

---

[9] Given our disposition, we need not, and do not, address defendant's contention regarding the violation of ORS 133.575(3).