Submitted September 24, 2013, affirmed September 4, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ALYSSA LINN HUNT,
aka Alyssa Hunt,
*Defendant-Appellant.*

Multnomah County Circuit Court
110646544; A149706

335 P3d 288

Peter Gartlan, Chief Defender, and Erin Snyder, Deputy Public Defender, Office of Public Defense Services, filed the opening brief for appellant. On the reply brief were Peter Gartlan, Chief Defender, and Kyle Krohn, Deputy Public Defender, Office of Public Defense Services.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Defendant appeals a judgment of conviction for unlawful possession of heroin, ORS 475.854. She assigns error to the trial court's denial of her motion to suppress evidence, arguing that the officer stopped her without reasonable suspicion because the informant's report lacked sufficient "indicia of reliability" to establish reasonable suspicion. Because we conclude that the informant's report was reliable, we affirm.

This court reviews the denial of a motion to suppress for errors of law and we are bound by the trial court's findings of historical facts as long as there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

On the day in question, a front desk clerk at a Portland motel received several calls from the guests staying in the room next to defendant's room. In the first call, the guests complained that there were some people outside defendant's room displaying "twitchy" body movements. They also reported that a "really dirty" Lexus had driven through the motel's parking lot a couple of times. The clerk walked around the property twice and saw two "girls" standing outside that motel room and an occupied "white Lexus" parked directly in front of the room, which was located on the ground floor of the motel. The clerk took a photo of the car's license plate. Although the clerk did not see any communication between the people in the Lexus and the "girls" in the room, he assumed that "there [was] association between the two parties."

About 15 minutes later, the guests called again, telling the clerk that they had seen people inside the Lexus arguing and weighing things on a small scale. The clerk called the police and reported what the guests had told him, but the person who answered his call told him that there was not enough information to send an officer to the scene. About 30 minutes later, the guests called to complain to the clerk for a third time. They told the clerk that they had seen "a cash transaction [between] the girls that were in the room and the people inside the Lexus and then an

exchange." The clerk called the police again and reported what the guests had seen; Portland Police Officers Kemple and Almos arrived 10 to 15 minutes later. Kemple was armed, in uniform, and wearing a badge.

Upon the officers' arrival, the clerk informed them of what the guests had told him, what he had seen when he walked around the property, and that the room was registered in defendant's name.[1] The officers then went to the motel room and knocked on the door. Two women, defendant and Sabin, answered. In a "pretty low-key" manner, Kemple asked them for identification and wrote down their information. He explained that the reason he was there was because "people had suspected them of possibly using drugs [in] the * * * room," but both women assured him that they had not been using any drugs. Kemple then asked if he could look in their room for drugs and drug paraphernalia, and defendant gave consent to search. Kemple walked around the room, but did not see anything in "plain view."

Following the search of the room, Kemple returned to the patrol car to run warrant checks on defendant and Sabin while Almos stayed at the room. Upon returning to the room, Kemple announced that the warrant check had "come back clear." As the officers were getting ready to leave, a gold Lexus drove into the motel parking lot, the driver looked at the officers, and then quickly drove away.

Kemple asked defendant who was in the Lexus and defendant told him it was her boyfriend, Simone. Kemple then asked defendant why she thought Simone drove away so quickly. Defendant, who had become visibly nervous, responded that she "had no idea." Kemple asked defendant if there was "anything in the room that would make him want to leave and she started to answer [but] her friend Sabin interrupted her and said no."

---

[1] Defendant notes in her brief that the facts at this point are in dispute. Although the trial court found that the clerk had conveyed the same information to Officer Kemple that he had conveyed to the police dispatcher, during the motion hearing Kemple testified that the clerk told him something slightly different, *i.e.*, that "[s]everal [m]otel guests had seen or heard arguing, they'd seen scales, and they said they saw smoke from the room and they said that the arguing was drug related. And then [the clerk] told me that there was a car—a gold Lexus that was associated with the room." We do not find those factual differences consequential to our analysis.

Kemple then asked defendant if there were drugs in the room and, again, Sabin interrupted and said "no." Sabin also told Kemple that she and defendant were recovering heroin addicts. Kemple asked Sabin to speak with Almos so that he could speak to defendant privately. During Kemple's private conversation with defendant, she admitted that she had used heroin about a week before, but stated that she did not have any on her currently. Kemple asked defendant if there was any heroin hidden in the room and defendant told him he could "come in and look." Kemple then asked defendant if she was taking any medication and, after learning that she was diabetic, asked defendant if she used needles. Defendant acknowledged that she did and pointed to a pink bag. At Kemple's request, defendant opened the bag, revealing a needle which contained a brown liquid that defendant admitted was heroin. Kemple arrested defendant, gave her *Miranda* warnings, and put her in a patrol car. A subsequent search conducted pursuant to Sabin's consent revealed two more needles containing heroin that defendant admitted were hers. Kemple's manner during the entire encounter with defendant was "low-key," "polite," and "relaxed."

After being charged with unlawful possession of heroin, defendant moved to suppress evidence obtained as a result of the search and seizure, contending that the officers did not have reasonable suspicion to stop her. The trial court denied that motion, concluding that the officers "had reasonable suspicion to investigate the occupants of the [motel] room based on [the] description" that the front desk clerk had given them. The court acknowledged that "[t]heir initial investigation * * * was unfruitful" but found that, at the point the gold Lexus appeared, the officers had "more than reasonable suspicion to continue the stop[.]"

On appeal, defendant renews her argument that, because the informant's report was not reliable, the officers stopped her without reasonable suspicion. Defendant also argues that, even if the officers initially had reasonable suspicion to stop her, that suspicion dissipated before the officers announced their intention to conduct the warrant check and, therefore, the warrant check amounted to an unlawful stop. Because on appeal the state does not dispute that defendant was stopped, we do not address that issue.

*See State v. Moore*, 264 Or App 86, 89, 331 P3d 1027 (2014) (declining to address whether the defendant was stopped where that issue was not raised by the parties). Accordingly, the only issue on appeal is whether the officers had reasonable suspicion to stop defendant under Article I, section 9, of the Oregon Constitution. For the following reasons, we conclude that they did.

A police officer may stop and temporarily detain a person without a warrant in order to make a reasonable inquiry of that person if the officer has reasonable suspicion that the person has been or is about to be involved in criminal activity. ORS 131.615(1). An officer has reasonable suspicion if he or she "holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts[.]" ORS 131.605(6). Thus, "[a] stop must be based on the officer's subjective belief that a crime has been or is about to be committed, and that subjective belief must be objectively reasonable under the totality of the circumstances." *State v. Wiseman*, 245 Or App 136, 140, 261 P3d 76 (2011).

A reliable report from a citizen informant may be sufficient on its own to provide reasonable suspicion; however, "[w]hen reasonable suspicion is based *solely* on a citizen informant's report, that report must contain some indicia of reliability." *State v. Villegas-Varela*, 132 Or App 112, 115, 887 P2d 809 (1994) (emphasis added). There are three factors that are important in determining the reliability of a citizen informant's report. *Id.* The first factor is "whether the informant is exposed to possible criminal and civil prosecution if the report is false." *Id.* That factor is satisfied if the informant gives his or her name to law enforcement or delivers the information in person. *Id.*

The second factor is "whether the report is based on the personal observations of the informant," which may be inferred by an officer if the information in the report contains sufficient detail to show that it was not fabricated and "the report is of the sort which in common experience may be recognized as having been obtained in a reliable way." *Id.* (internal quotation marks and citations omitted). Even if the second factor is not satisfied "in the strictest sense,"

because an informant is relaying information second-hand, this "does not necessarily undermine the reliability of the report." *State v. Mitchele*, 240 Or App 86, 92-93, 251 P3d 760 (2010). To assess the reliability of the informant's information we examine the circumstances to assure "that the particular information is indeed trustworthy on a specific occasion." *State v. Alvarez*, 308 Or 143, 147, 776 P2d 1283 (1989).

The final factor is "whether the officer's own observations corroborate the information provided by the informant," which may occur when the officer observes the illegal activity or finds the person, vehicle, or location substantially as the informant describes. *Mitchele*, 240 Or App at 91. The three factors "are not determinative of whether a citizen informant's report is reliable; they are merely intended to serve as an aid in evaluating the reliability of such a report." *Id.* at 92-93.

Defendant contends that the first factor—whether the informant was exposed to prosecution—is not satisfied because, by "acting merely as a conduit for the [m]otel guests' complaints, * * * the [front desk clerk] did not expose himself to civil or criminal liability." We disagree. In *State v. Villagran*, 294 Or 404, 409, 657 P2d 1223 (1983), the Supreme Court said that "[e]veryone who gives information to the police is an 'informant' in the classic dictionary sense[.]" In this case, the front desk clerk is the informant because he communicated with the police. Although, the motel guests are surely a source of some of the front desk clerk's information, the first factor was satisfied because the front desk clerk identified himself to the dispatcher when he called to report the guests' complaints and he identified himself to the officers when they arrived at the motel to investigate those complaints. *See Mitchele*, 240 Or App at 91 (holding that the first factor was satisfied because the caller gave the officers his identifying information).

Defendant also argues that the second factor was not satisfied because the front desk clerk was not offering personal observations of the alleged criminal conduct. In *Mitchele*, a man called law enforcement to report a suspicious person in his neighborhood. Relaying information that

he had learned from his wife, he told the officers that there was a "guy possibly casing, walking up and down the street, and looking at homes." *Id.* at 88 (internal brackets and quotation marks omitted). He also told them that the suspicious person was a white male who was wearing a black jacket and sweatpants, and a black and red stocking hat. *Id.* When the officers arrived about 20 minutes later, they encountered the defendant—a white male wearing black pants, a black shirt or jacket, and a stocking hat. *Id.* at 88-89. As the officers drove toward the defendant, he tried to "tuck" himself into the nearby foliage. *Id.* at 89. Subsequently, the officers arrested the defendant and charged him with unlawful possession of methamphetamine. *Id.* We concluded that, although the informant had relayed information second-hand from his wife, the first factor was satisfied because he gave his name, address, and telephone number to the officers. In addition, the third factor was satisfied because the officers corroborated the information. *Id.* at 92.

Ultimately, we concluded that the informant's report was reliable even though "the second factor [was] not satisfied in the strictest sense." *Id.* at 93. We reasoned that, although "reporting a spouse's observations does not present the normal scenario under which we conclude that the second factor is satisfied, * * * [it] does not necessarily undermine the reliability of the report" because the report's details were sufficient to show that neither the caller nor his wife had fabricated it. *Id.* at 92. In addition, we noted that the defendant "fail[ed] to present a reason why either the caller or the caller's wife would fabricate the information[.]" *Id.* Furthermore, we determined that "their spousal relationship suggests that the caller would and did believe the source of the information and that the information had been reliably obtained." *Id.*

Similarly here, although the second factor—whether the report is based on the personal observations of the informant—is not satisfied "in the strictest sense," it does not "undermine the reliability of the report." *Id.* at 92-93. Here, the motel guests called the front desk clerk on three separate occasions to complain about defendant, suggesting that the guests were not fabricating the story. *See State v.*

*Dickenson*, 43 Or App 1023, 1025-26, 607 P2d 754 (1979) (the stop of the defendant was justified based on "numerous complaints" by anonymous callers that the defendant had been illegally taking salmon). The information that the guests gave the clerk included details such as the number of "girls" staying in that particular room and that there was a white Lexus parked directly in front of the room where the "girls" were staying. Further, the clerk obtained the Lexus's license number. Those details are sufficient to show that neither the front desk clerk nor the guests had likely fabricated the report. *See State v. Lindstrom*, 37 Or App 513, 515-16, 588 P2d 44 (1978) (an unnamed informant's tip that the driver of a yellow Ford pickup truck was driving recklessly, had aimed a rifle at him, and appeared intoxicated "constituted information of sufficient quantity and quality to give rise to a reasonable suspicion"); *State v. Simpson*, 245 Or App 152, 157-58, 261 P3d 90 (2011) (an anonymous report that a yellow Corvette was involved in a traffic accident that included the Corvette's license plate number, the location of the vehicle, and that the driver was intoxicated, was sufficiently detailed to infer that the caller "did not fabricate it"). *But see State v. Black*, 80 Or App 12, 19, 721 P2d 842 (1986) (determining that an anonymous tip that a brown Ford Escort, traveling north on Highway 199, was speeding and weaving did not have any indicia of reliability because it was not clear if the caller had personally observed what she reported).

In addition, although the relationship in this case was not a spousal one, like the one in *Mitchele*, we can infer that the relationship that guests have with a motel, and with the motel's front desk clerk, suggests that it is reasonable that a guest would report a problem to the front desk clerk, rather than calling law enforcement directly, and expect that the clerk would follow-up on the problem, as the clerk did in this case. Given the circumstances here, the motel-guest relationship suggests that the front desk clerk would and did believe the guests' complaints and that the information had been reliably obtained. Accordingly, although the second factor is not satisfied "in the strictest sense," *Mitchele*, 240 Or App at 93, we conclude that the information that the front desk clerk received from the motel guests was recognizable "as having been obtained in a reliable

way." *Villegas-Varela*, 132 Or App at 115 (internal quotation marks omitted).

Finally, defendant contends that the third factor is not satisfied because the officers' observations did not "substantially" corroborate the information in the report. Specifically, defendant notes that the officers "did not observe the Lexus, anyone loitering outside defendant's room, or any indication that defendant had consumed or was under the influence of controlled substances." Although the officers did not corroborate all of the information in the report, they did corroborate the location of the motel room, the room's number, as well as the number of "girls" who were in the room.[2] Furthermore, nothing that the officers saw contradicted anything in the report. *See Simpson*, 245 Or App at 157-58 (where the officer's observations "corroborated at least some of the information in the report" and did not contradict anything in it). Based on those three factors, we conclude that the report was sufficiently reliable to support reasonable suspicion that defendant had been involved in a drug transaction.

Defendant contends, however, that even if the officers had reasonable suspicion to stop defendant, that suspicion dissipated before Kemple announced his intention to conduct the warrant check and, as a result, Kemple unlawfully stopped defendant by conducting the warrant check. We disagree. Under ORS 131.615, an officer who has reasonable suspicion that a person has committed a crime may stop that person and make a reasonable inquiry. Under the circumstances, asking for defendant's identification and running a warrant check to confirm defendant's identity was reasonably related to the officers' investigation.

We conclude that the report was sufficiently reliable to justify reasonable suspicion that defendant had committed or was committing a crime. Accordingly, the stop was lawful and we affirm the trial court's denial of defendant's motion to suppress.

Affirmed.

---

[2] For an extensive overview of cases in which an informant's report was adequately, or inadequately, corroborated by the officers see *State v. Hames*, 223 Or App 624, 196 P3d 88 (2008).