Argued and submitted January 25, 2013, reversed and remanded August 27, 2014

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**TYLER CHARLES GOECKS,**
*Defendant-Appellant.*

Washington County Circuit Court
C092834CR; A147307

333 P3d 1227

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services. Tyler Goecks filed the supplemental brief *pro se.*

Janet A. Klapstein, Senior Assistant Attorney General, argued the case for respondent. John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Douglas F. Zier, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Defendant, who was convicted of unlawful possession, manufacture, and delivery of marijuana, argues that the trial court erred in denying his motion to suppress evidence found in his residence after a search that the police had conducted pursuant to a search warrant. In the trial court, defendant moved to controvert the affidavit made in support of the warrant and to suppress evidence obtained as a result of the warranted search. ORS 133.693. The trial court granted the motion to controvert but concluded that, as controverted, the affidavit nonetheless established probable cause for issuance of the warrant. The court therefore denied defendant's suppression motion. Defendant appeals, and, as explained below, we agree with defendant that, in light of the controverted information in the affidavit, there was not probable cause to issue a warrant to search defendant's residence.[1] Accordingly, we reverse and remand.

The facts of this case are unusual, and thus, at the outset, we clarify the legal framework for controversion of affidavits in support of warrants. In a nutshell, this case concerns a situation in which the affiant, an officer for the Tigard Police Department, set forth in his affidavit information provided to him by a named informant that ultimately proved to be, for the most part, fabricated by the named informant in cooperation with one of the officer's confidential informants. As the parties correctly recognize, however, a motion to controvert allows a defendant to challenge the "good faith, accuracy and truthfulness of the affiant," ORS 133.693(2), but *not that of the informant." State v. Coffey*, 309 Or 342, 349, 788 P2d 424 (1990) (emphases in original). Thus, the focus here is on what the officer put in the affidavit, and not on the fact that much of the information in the affidavit ultimately proved to be false. To reiterate—the issue, as set forth in more detail below, concerns the "accuracy" of the affiant in relating in his affidavit his knowledge of the relevant circumstances, *not* the "accuracy" of the information provided to him by the informant.

---

[1] Because defendant's *pro se* supplemental brief also challenges the search warrant, we do not separately address it.

With respect to our standard of review,

> "[t]he sufficiency of the search warrant affidavit presents a legal question for each reviewing court, beginning with the trial court. That is, as in the trial court, the question before the Court of Appeals [is] whether the issuing magistrate could have concluded that the affidavit (excluding the excised parts) established probable cause to search defendants' home. As to that question, the Court of Appeals [is] in the same position as was the trial court to evaluate the sufficiency of the facts alleged in the affidavit, the reasonableness of any inferences involved in resolving the legal question presented by the probable cause determination, and, ultimately, the existence of probable cause to support the warrant. No appellate court deference to the trial court's findings or conclusions [is] appropriate or warranted.[6]

----

> "[6] * * * [W]ith respect to the facts that the trial court relied upon to support its decision to excise certain facts from the affidavit, the Court of Appeals, as the reviewing court, is bound by the trial court's findings of fact, if there is evidence in the record to support them. *State v. Johnson*, 335 Or 511, 523, 73 P3d 282 (2003); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). That, however, does not affect the standard of review that the trial court, or the Court of Appeals, was required to apply in reviewing the remainder of the affidavit for probable cause. Rather, those courts were required to evaluate the sufficiency of the affidavit based on the remaining accurate allegations in the affidavit after excision. *See, e.g., State v. Harp*, 299 Or 1, 9, 697 P2d 548 (1985) (describing process)."

*State v. Castilleja*, 345 Or 255, 265-66, 192 P3d 1283, *on recons*, 345 Or 473, 198 P3d 937 (2008).

In this case, as noted, the trial court did find that the affidavit contained inaccuracies and omissions. Evidence in the record, as described in detail below, supports the trial court's conclusion in that regard. With the above framework in mind, we turn to the pertinent facts. We first recount the information as recited in the affidavit in support of the warrant, then the facts adduced at the hearing in support of the motion to controvert, in a manner consistent with the trial court's explicit and implicit findings.

In mid-December 2009, Officer Rollins of the Tigard Police Department applied for and received a warrant to search defendant's residence. In his affidavit in support of the warrant, Rollins recited his training and experience in drug interdiction, as well as the following details concerning his belief that evidence of marijuana crimes would be located in defendant's residence:

"1. On 11/27/09, I read an email, sent to me by * * * Tigard Police Officer [Hahn]. Officer Hahn told me, through this email, that a package of information, including a USB mass storage device, had been delivered to the Tigard Police Department with the instruction of delivering it to me. Officer Hahn requested that I look through the information at my earliest convenience.

"2. Through later information, I discovered this package of information was delivered to me based on a prior investigation I had conducted regarding the subject of the information.

"3. On 11/27/09, I took possession of the materials sent to me at the Tigard Police station. Among the materials was a USB mass storage device that contained numerous pictures of a marijuana grow operation. (See Attachment A) In the pictures, I could observe many mature and immature marijuana plants growing. I was able to determine, through site [*sic*] alone, that the plants were indeed marijuana, using my experience and the training I have received.

"4. A letter in the package of materials stated that a female named Sereana, (Sereana Opal Van Meter, [identified by birthdate and other information]) was providing me with information related to a marijuana grow operation that was being conducted in Tigard, Oregon by a white male named Tyler Charles Goecks [identified by birthdate and other information]. I identified Sereana by her Oregon driver's license, which she presented to me at our first personal meeting. I observed that the picture on the Oregon driver's license matched Sereana's appearance. I performed a criminal history check on Sereana using WEBLEDS, I did not discover any criminal history for Sereana.

"5. I also discovered that I had spoken with and met several of Sereana's friends and acquaintances in the previous months. Sereana was directed to me through these

friends and acquaintances, having been informed that I had been involved in prior investigations regarding Tyler.

"6. Based on prior cases and investigations, Tyler was known to me and I was familiar with his person, identity, residence and vehicles. I am aware that Tyler currently resides at 11045 SW 106th Ave, Tigard, OR 97223, Washington County, Oregon. I know that Tyler is approximately 6'5" tall, weighs approximately 225 pounds, and has brown hair and blue eyes.

"7. The letter, written/typed by Sereana, stated that she befriended Tyler at the request of her friend. Sereana stated that while in the midst of the relationship with Tyler, she personally observed and photographed a marijuana grow operation he was conducting from the garage of his residence. Sereana stated that she smoked Tyler's grown marijuana with him on occasions, as well as consumed alcoholic beverages with him. The letter provided me with a telephone number to contact Sereana at, if I discovered additional information would be needed.

"8. I attempted to contact Sereana at the provided telephone number on 11/27/09, but received only a voicemail box. I left Sereana a message and asked her to return my call.

"9. On 11/27/09, at 2048 hours, I received a text message ***. The text message stated that Sereana would return my call the following day.

"10. On 11/28/09, at about 1600 hours, I received a call from a female identifying herself as Sereana. During this telephone call, Sereana reiterated the contents of the letter she had written to me earlier. Sereana acknowledged writing the letter and stated she had been the person who had taken the photographs of the growing marijuana plants in Tyler's garage.

"11. I asked Sereana if she would be willing to talk with me in person about the facts surrounding the marijuana grow operation she had observed. Sereana told me she needed to think about whether or not she wanted to meet with me and provide a statement. Sereana said she would contact me when she had come to a decision about that matter.

"12. On 12/10/09, at about 1304 hours, I received a text message from Sereana. In this message, Sereana told

me that she had decided she would meet with me in person and provide a statement concerning the marijuana grow operation being conducted by Tyler. I arranged to meet with Sereana, at the Tigard Police Station, at 2030 hours, later that same day.

"13.   On 12/10/09, at about 2030 hours, I met with Sereana at the Tigard Police Station. I asked Sereana to explain to me how she initially came into contact with Tyler. Sereana informed me that she initially met Tyler through a social networking website called PlentyofFish.com.

"14.   According to Sereana, she was initially told about Tyler by an acquaintance of hers named Jennifer. Sereana told me that Jennifer was an ex-girlfriend of Tyler's and that Jennifer described Tyler to Sereana as a womanizing, arrogant, selfish jerk. Sereana explained to me that due to prior occurrences in their friendship, she felt as though she owed Jennifer a favor. Jennifer asked Sereana to befriend Tyler, in an effort to gain his trust in order to be a witness to, and take pictures of, his marijuana growing operation. Sereana said Jennifer did not tell her what she planned to do with the pictures or what the ultimate goal of this plan was. Sereana said she did not ask Jennifer these specific questions, stating that because she felt as though she owed Jennifer this favor, she would perform the task with no regard to the final outcome.

"15.   Sereana placed a personal profile on the social networking website, PlentyOfFish.com, on an unknown day, near the end of the month of September 2009. Sereana said she knew that Tyler perused the website on a regular basis, looking for females to converse and network with. Sereana said that within 72 hours, Tyler discovered her profile on the website and contacted her through the website messenger.

"16.   Sereana stated that in Tyler's initial message to her, he commented that she was 'cute' and asked her if she would like to meet and spend time together. Sereana agreed and they exchanged 2 additional emails, as well as telephone numbers. Sereana said they made phone calls to each other and went on a date for the first time in early October. On their initial date, Sereana said that she and Tyler went to a local bar for alcoholic beverages. After drinking beverages at the bar, Sereana and Tyler drove back to Tyler's residence in Tigard to continue their date.

"17. During their date, Sereana said that Tyler frequently talked to her about 'all the money he was making' and that he grew marijuana plants in his residence garage.

"18. Sereana continued to date Tyler, several times, between the dates of early October and November 14, 2009, making 6-7 total visits to the inside of Tyler's residence. During this time period, Sereana stated that Tyler consistently bragged that he was making large amounts of money from the marijuana he grew in his residence garage. Sereana recalled a conversation she and Tyler had while seated in the living room of his residence where Tyler stated, 'I have a medical marijuana card to grow marijuana and that's how I make a living.' Sereana also recalled Tyler explaining to her that he did not need a regular job because he made money by selling marijuana. Sereana told me that she never saw or heard of Tyler possessing a legal job during this time.

"19. On the date of November 14, 2009, Sereana went on a date with Tyler and after the date, both went to Tyler's residence to spend time together. Sereana said that while she was at Tyler's residence on this night, she asked Tyler to show her the marijuana growing operation he had. Tyler walked Sereana into the garage of the residence and she immediately noticed that a portion of the garage had been walled off, creating separate rooms within the structure. This type of construction in [sic] common in marijuana growing operations. The separate rooms allow the marijuana cultivator to control the levels of light, heat, and other atmospheric conditions within the grow area.

"20. Sereana stated that when she entered the marijuana grow area, it was set up in an L-shape format. Sereana said she observed 5 grow lights attached to the ceiling along this L-shape. Underneath the lights, she observed numerous large black-colored potting plant baskets, each containing what she described as a 'mature marijuana plant.' I asked Sereana how many mature marijuana plants she observed growing in the room on that night and she said, '17.'

"21. Sereana also stated that she saw several immature marijuana plants growing in a separate room, adjacent to the room that held the mature marijuana plants.

"22. I asked Sereana about her history with marijuana and what information she could provide that would

verify her ability to recognize growing marijuana. Sereana admitted that she has smoked marijuana in the past, on several occasions with Tyler. Sereana said Tyler always referred to the marijuana they smoked together as his 'homegrown.' Sereana then drew her rendition of a marijuana leaf on a piece of paper. Her drawing did accurately represent a marijuana plant, containing five leaf blades, with an accurate shape. Sereana also described the jagged shape of the outside of the marijuana leaves. Sereana told me that she has seen growing marijuana plants on prior occasions.

"23.   I asked Sereana to provide me with her definition of a 'mature' marijuana plants [sic]. Sereana said she would consider any marijuana plants. [sic] that had buds on it a mature plant. Sereana's definition of a mature marijuana plant fits within the definition of a mature marijuana plant, as given by the Oregon Medical Marijuana Program (OMMP). The OMMP designates any marijuana plants that has begun to flower or bud, or is greater than 12 inches in height or width, a mature plant.

"24.   Sereana stated that during the night of November 14, 2009, unbeknownst to Tyler, she was able to take 13 photographs of the marijuana grow operation. According to Sereana, she took the pictures after Tyler had passed out from intoxicant consumption. When I viewed the photographs, delivered to me by Sereana on a USB mass storage device, I was able to recognize at least 17 separate mature marijuana plants, growing in pot containers. I was able to use the background and different wall features to distinguish the separate plants. (See attached photographs-Attachment A)

"25.   Sereana used a recent magazine; the October 2009 issue of MAXIM, to date stamp the photographs. The magazine can easily be viewed in most of the photographs, indicating the photographs were definitely taken after the release of the magazine issue. Among the photographs, several immature marijuana plants can also be seen.

"26.   On 12/11/09, at about 1219 hours, I contacted Jennifer Alcaraz at OMMP, through the Department of Human Services. I asked for verification that Tyler is a Medical Marijuana cardholder, designated as a caregiver/grower and that his residence, 11045 SW 106th Ave.

Tigard, OR 97223, Washington County, Oregon, is a registered marijuana grow site. Jennifer returned my call and inquiry at 1223 hours and verified that Tyler is registered under the Medical Marijuana Program as a caregiver/grower for another patient that is not himself and that his residence address is a registered grow site. Under the rules and laws of the Medical Marijuana program, Tyler would only be allowed to possess/grow 6 mature marijuana plants and 18 immature marijuana seedlings at any given time. Based on the reports and photographs from Sereana, Tyler is well above his designated grow limits and in violation of ORS 475.320.

"27. At the end of our conversation at the Tigard Police Department, I told Sereana that while I believed her information regarding Tyler, I was concerned that the pictures she took and her last visible proof of the growing marijuana plants occurred too long in the past to substantiate an affidavit. After expressing this to Sereana, I told her, several different times, that I would not ask, encourage, direct, or support her continued interaction with Tyler. I expressed to Sereana that she should discontinue all interaction with Tyler, if the purpose of that interaction was to further a criminal investigation. During this interview, Officer Christopher Haynes * * * was present at all times.

"28. On 12/11/09, I received a text message from Sereana, indicating that against my advice and forewarning, she had contacted Tyler in the later evening hours of 12/10/09. Sereana stated that she had again, visibly observed what she counted to be 20 mature marijuana plants growing in Tyler's residence garage. Sereana also stated she was able to take several photographs of the marijuana grow operation on the night of 12/10/09, unbeknownst to Tyler. Sereana and I agreed to meet in person at the Tigard Police Station on 12/11/09 at about 1400 hours, to discuss the information.

"29. I met with Sereana at the Tigard Police Station at about 1420 hours on 12/11/09. Sereana told me that she, independently, decided to meet with Tyler in the evening hours of 12/10/09, after our interview that night had been concluded. I recalled that as the interview was taking place on the night of 12/10/09, Sereana informed me that Tyler was sending her text messages, asking to spend time with her. Sereana stated that she drove to Tyler's residence at about 2200 hours on 12/10/09 and entered.

"30. While at Tyler's residence on 12/10/09, Sereana stated that she again gained access to the marijuana grow area and observed what she described to be 21-22 mature marijuana plants. Sereana took 11 photographs of the growing marijuana plants on 12/10/09 and showed me the photographs. When I viewed the photographs, I could clearly observe a minimum of 19 mature marijuana plants, I also could clearly observe a minimum of 33 immature marijuana seedlings. (See attached photographs-Attachment B)"

To summarize: Rollins averred that he was personally familiar with defendant's address and appearance, based on some prior unspecified investigation,[2] and that he had contacted the OMMP and determined that defendant's residence was a registered site to grow marijuana under the OMMP that was authorized to grow six mature marijuana plants and 18 immature marijuana plants. He averred that he was able to recognize the plants in the pictures provided to him as marijuana plants and was able to see that the number of plants exceeded the number that defendant was authorized to grow under the OMMP. In addition, it may be fairly inferred from the affidavit that Rollins had obtained all of the recited information concerning the then-current status of defendant's marijuana-growing operation from the informant, Sereana Van Meter.

At the hearing on the motion to controvert, a different story emerged. In January 2009, a woman named Shasta gave Rollins a "hate manifesto" concerning defendant's treatment of an ex-girlfriend. Shasta also gave Rollins a USB drive that contained pictures of growing marijuana plants, and information that defendant was growing marijuana. At that time, Rollins discarded the "hate manifesto," believing it to have no evidentiary value.

In August 2009, Rollins was contacted by defendant's ex-girlfriend, Talbert, who indicated that defendant had possession of a motorcycle and a gun that she wanted to get back. Rollins advised Talbert that her dispute with defendant concerning their possessions was a civil matter

---

[2] Rollins testified at the hearing on the motion to suppress that he had previously investigated defendant with respect to a marijuana-growing operation at a different address than his residence.

about which the police could not help her. Talbert also told Rollins that defendant was growing marijuana and mentioned several locations where she believed defendant was selling marijuana. Because Talbert was not willing to "go on record" as having first-hand knowledge of marijuana crimes, and her information related to activities that had occurred months earlier, Rollins told her that there was nothing that the police could do with her information.

Shortly after her unsuccessful meeting with Rollins, Talbert arranged to hire Van Meter to date defendant. Talbert set up Van Meter's online profile on the PlentyofFish website. Defendant viewed the Van Meter profile and attempted to contact her through the information provided, and Talbert responded, pretending to be Van Meter. Talbert arranged a "date" between defendant and Van Meter, and Talbert paid Van Meter $1,000 to go on the date. In mid-November 2009, Van Meter went on the date with defendant. She did not go into defendant's garage or see his marijuana plants. While out with defendant, Van Meter called Talbert to let her know that they had arrived at the location of the date, at which point Talbert broke into defendant's residence and photographed the marijuana plants in defendant's garage.

Shortly thereafter, Talbert offered Van Meter an additional $500 to deliver to the Tigard police the pictures that Talbert had taken of the marijuana growing in defendant's garage. Van Meter agreed, and Talbert arranged a meeting. Tigard police officers met with Talbert and Van Meter in a parking lot, where Talbert and Van Meter provided the officers with an envelope containing three letters and a USB drive. Talbert asked the officers to give the information to Rollins, indicating that it was evidence to be used against defendant. Talbert and Van Meter declined to give the officers their names. The officers turned the items over to Hahn, who in turn forwarded the information to Rollins on November 25, 2009.

The pictures on the USB drive were as described in Rollins' affidavit, quoted above. The three letters were all unsigned. One of them contained somewhat similar information to that attributed to Van Meter as described in

paragraphs 18 through 21 of the Rollins affidavit, except that it contained no information about Van Meter's identity or any contact information. The second letter, addressed to "judge and narcotics officers," indicated that its authors hated defendant because he had mistreated his girlfriends. That letter further provided that "[o]ne of us" had met with Rollins, who had not been able to proceed based on their information, so they arranged for a woman to date defendant and take pictures of defendant's marijuana plants. That letter provided a telephone number for the police to use to contact the authors if further information was needed. The third letter, addressed to Rollins, requested that Rollins contact Talbert as soon as defendant was arrested "and let her get her property (at his residence) while he is not there." That letter reiterated that defendant possessed a gun and motorcycle belonging to Talbert.

After Rollins received the package, he contacted Hahn and indicated:

> "It's from the same girl that [sic] I originally talked to before I left [in January]. She also gave me a thumb drive and a manifesto from an ex[-]girlfriend,[3] the one mentioned in the papers. When I met with her originally, she said she wouldn't give up [defendant's] marijuana so I told her there wasn't alot we could do."

Rollins called the telephone number left in the second anonymous letter and left a message. On November 28, he received a text message reply indicating "[w]e want to help, serena and i will call u around 4pm tomorrow." (Capitalization in original.) Rollins later received a return call from Van Meter. Rollins explained to Van Meter that he could not proceed with the investigation unless a named informant would come forward and agree to testify in court. Van Meter told Rollins she was not willing to go forward at that point, and that she would be back in touch.

On December 10, Rollins received text messages indicating "[t]his is serena" and "[i]f can meet tonight 8:30 ill go on record," and asking to "[m]eet at melanie house

---

[3] At the hearing on the motion to controvert, Rollins testified that he believed that the ex-girlfriend in the "manifesto" was Melanie Talbert. It is not clear when Rollins formed that belief.

and pls bring whatever need so only hav to do this once."
(Capitalization in original.) Rollins responded that they
would need to meet at the police department, then received
an additional text asking, "[c]an I bring girlfriends for moral
support?" to which he replied that she could.

Talbert and Van Meter went to the police station
to meet with Rollins at 8:30 p.m. on December 10. Before
they entered the station, Talbert gave Van Meter the USB
drive with the photos. During the meeting, Van Meter pro-
vided Rollins with her identification, then told the story on
which she and Talbert had agreed—that Van Meter had
dated defendant in October and November and had taken
the photographs of his marijuana plants that were shown
on the USB drive. Van Meter made statements to Rollins
concerning the circumstances of her photographing the
marijuana plants that were inconsistent with the state-
ments that had been made in one of the anonymous letters
about the circumstances of her taking the photographs.
When Van Meter had difficulty describing the garage in
which the plants were located, Talbert interjected and pro-
vided a description of the garage. Rollins was aware from
his previous contact with Talbert that Talbert had helped
defendant construct the grow-room in the garage. Rollins
told Talbert and Van Meter that the photos were "too old"
to be of use.

After Talbert and Van Meter left the meeting
with Rollins, Van Meter arranged for another date with
defendant later that evening. When she was on the date
with defendant, Talbert again broke into defendant's resi-
dence and took additional photographs of defendant's mar-
ijuana plants. Shortly after midnight, Talbert sent a text
message to Rollins, indicating that Van Meter had taken
more photographs of the marijuana plants, that Talbert
had the camera and would download the photos onto her
computer, and that they would contact him in the morn-
ing. On December 11, 2009, Talbert and Van Meter again
met with Rollins at the police department. Van Meter
told Rollins that she had taken new photographs of the
marijuana plants. Talbert brought her laptop computer to
this meeting, and Rollins viewed the pictures on Talbert's
computer.

Before describing the trial court's letter opinion granting the motion to controvert and denying the motion to suppress, it is helpful to emphasize what a trial court is to do in a situation such as this, where an affidavit has been controverted:

> "With regard to the method of review of the factual sufficiency of the affidavit, the suppression judge begins with the affidavit(s) and record, if any, upon which the magistrate issued the warrant. ORS 133.555. The judge then evaluates whether the defendant has proven by a preponderance of the evidence that the evidence upon which the magistrate relied was inaccurate. ORS 133.693(3). *If the defendant proves inaccuracies, the judge must then assess the sufficiency of the affidavit on the basis of the remaining accurate facts in the affidavit.* Contrary to the suggestion in [*State v. McManus*, 267 Or 238, 251, 517 P2d 250 (1973)], *the suppression judge does not consider the 'corrected' evidence. The judge's assessment is a process of subtraction, not addition.* The purpose of the proceeding is to ensure that the affidavit and record, if any, upon which the magistrate relied contained accurate factual information and that this information conveyed probable cause to issue the warrant."

*State v. Harp*, 299 Or 1, 9, 697 P2d 548 (1985) (emphases added). Although the court does not "correct" an affidavit by adding evidence, we have held that "one way of subtracting from an affidavit is to use the additional information developed on the motion to controvert in order to weaken the force of the officer's statements in the affidavit." *State v. Pelster/Boyer*, 172 Or App 596, 599, 21 P3d 106, *rev den*, 332 Or 632 (2001). After considering the controverting information in that manner, the court then must determine whether the remaining information in the affidavit establishes probable cause. When considering information provided by a named informant, the informant's veracity may "be established in several ways including corroboration by the police, corroboration by another informant, the informant exposing himself to liability for filing a false report or by the informant's statements against penal interest." *Id.* at 604.

Here, the trial court applied the legal premises described above and set out what it deemed to be the "proper contents of the affidavit." In doing that, the court noted numerous details from the testimony at the hearing that

it concluded should have been included in the affidavit. We summarize the trial court's conclusions, broken down into two categories: (1) inaccuracies to be deleted from the affidavit and (2) additional information developed on the motion to controvert that weakens the force of the officer's statements in the affidavit.

With respect to inaccuracies in the affidavit, the trial court excised from paragraph 4 of the affidavit the information indicating that the anonymous materials delivered to the Tigard Police station included a letter from Van Meter; excised from paragraph 5 information that Van Meter had been directed to Rollins by friends and acquaintances; excised from paragraph 7 the statement that one of the anonymous letters was written by Van Meter and that it contained contact information for Van Meter; excised from paragraph 19 that Van Meter had provided all of the details concerning the appearance of the room in which marijuana was being grown.

With respect to additional evidence that undermined other portions of the affidavit, the trial court found either explicitly or implicitly: Various evidence of Rollins's investigation of defendant was based largely on information provided to him by Talbert and people with whom Talbert was closely associated; Rollins knew that Talbert had an interest in obtaining property located at defendant's address; Rollins knew that Talbert wished to remain anonymous with respect to any criminal investigation of defendant; Rollins knew that Van Meter had been recruited by Talbert to date defendant; the contact information provided for Van Meter was not for direct contact with Van Meter, but generally involved going through Talbert; Talbert accompanied Van Meter in all of her contacts with Rollins; Talbert, who had previously told Rollins that she had helped construct defendant's grow-room, provided details concerning the appearance of the grow-room when Van Meter had trouble doing so; and there were discrepancies between the story given in the anonymous letters delivered by Talbert and Van Meter and the story told by Van Meter concerning the circumstances of the first photographing of the marijuana plants.

As noted above, "with respect to the facts that the trial court relied upon to support its decision to excise certain facts from the affidavit, we are bound by the court's findings if there is evidence in the record to support them." *Castilleja*, 345 Or at 266 n 6. Evidence in the record supports all of the trial court's findings described above. The legal question in this case thus reduces to "whether the issuing magistrate could have concluded that the affidavit (excluding the excised parts) established probable cause." *Id.* at 265.

As noted above, in circumstances such as these, a court is to use "additional information developed on the motion to controvert in order to weaken the force of the officer's statements in the affidavit." *Pelster/Boyer*, 172 Or App at 599. Here, defendant adduced evidence at the hearing on the motion to controvert that indicated that a large amount of the information that Rollins had about defendant's marijuana-growing activities came either directly or indirectly from Talbert, who made it very clear throughout her dealings with Rollins that she was *not* willing to be a "named informant" in a case against defendant, and that she intended to use the occasion of defendant's arrest to retrieve property from defendant's residence. To summarize, Rollins knew the following, none of which was disclosed to any significant extent in the affidavit: Talbert was defendant's ex-girlfriend; Talbert and her friends "hated" defendant; Talbert and her friends had been trying to interest the Tigard Police in investigating defendant for nearly a year; Talbert had helped defendant set up a marijuana-growing operation; Talbert wanted help from the police in securing a motorcycle and gun that were in defendant's possession; Talbert was instrumental in putting Rollins in contact with Van Meter and arranged and facilitated Rollins' contacts with Van Meter; Talbert accompanied Van Meter during all of her contacts with the police and provided details about the marijuana-growing activities that were attributed to Van Meter in the original affidavit; Talbert was in possession of the pictures allegedly taken by Van Meter on December 10, and, in fact, had them on her computer when they were brought to the police station. In sum, a significant amount of unrefuted evidence was presented at the hearing about what Rollins knew about the situation but

failed to disclose in the affidavit. That is, the original affidavit obscured the existence and motives of Talbert and her part in the investigation, disclosed only a small amount of information indicating that Van Meter had a possible bias, and failed to disclose discrepancies known to Rollins.

Thus, the question at this point becomes whether the affidavit, as controverted, supports a finding of probable cause to search defendant's residence for evidence of an unlawful marijuana-growing operation. In *State v. Villagran*, 294 Or 404, 409-10, 657 P2d 1223 (1983), the court provided guidance for assessing the reliability of information provided by an informant:

> "At the one extreme is the participant in the criminal activity who, for a variety of reasons, decides to become an 'informer' * * *—one who informs against another, often for money or for other reward or gain. Then there is the person who, though not a party to the crime, is closely connected with the criminal establishment. A third category would include witnesses, including victims. A fourth category would include other persons unconnected with the crime who provide information, the significance of which the provider may or may not be aware. Courts have held that persons in the latter two categories may be more worthy of belief than an informant from the criminal establishment. *See State v. Montigue*, 288 Or 359, 605 P2d 656 (1980); *United States v. Harris*, 403 US 573, 91 S Ct 2075, 29 L Ed 2d 723 (1971). Identification of the informant by name may also be a factor to consider."

Implicit in the *Villagran* framework is that "[c]ourts view those at the former end of the spectrum with the most suspicion and those at the latter end with the least." *State v. Forker*, 214 Or App 622, 629, 168 P3d 279 (2007), *rev den*, 344 Or 280 (2008). In this case, Van Meter would be considered an informant in the second category. Her criminal involvement was minor at best—involving using marijuana while dating defendant—and thus she probably does not squarely fit within the first category.[4] Moreover, because her

---

[4] We emphasize that our focus here is on Van Meter's criminal involvement as known to the affiant Rollins at the time that he obtained the search warrant. The criminality of Van Meter's acts as ultimately revealed at the hearing on the motion to controvert are not at issue. Moreover, although there was evidence that Rollins knew that Talbert had recruited Van Meter to provide incriminating

efforts—insofar as they were revealed to Rollins—involved a determined effort to obtain incriminating information about defendant's marijuana-growing operation by dating him and using marijuana with him, she could be said to be "closely connected with the criminal establishment." *Villagran,* 294 Or at 409.

The court in *Villagran* went on to note that, when nothing in the affidavit directly establishes an informant's veracity, it "would have to inhere in the circumstances of the inquiry, the nature of [the informant's] response, or other facts that tend to verify [the informant's] statements." 294 Or at 411.

We thus turn to that question of verification of the informant's statements. There is nothing inherent in the circumstances of this situation that tends to establish the informant's veracity. Rather, as noted above, there were numerous "red flags" indicating that a named, biased informant was, in fact, providing information on behalf of an undisclosed, biased informant. Although we have found no case with comparable facts, we readily conclude that the circumstances here were suspicious enough to require significant verification of the named informant's statements.

Our decision in *State v. Culley,* 198 Or App 366, 108 P3d 1179 (2005), informs the analysis here. In *Culley,* the police had "stale" information from confidential and anonymous informants that the defendants were involved in drug activities. In that case, the affiant indicated that he had been directed by other officers to contact a named informant, who told him that she had known the defendant for some time, that she was the girlfriend of one of their drug-dealing associates, and that she had very recently witnessed drug transactions at their residence. *Id.* at 369. The affiant did not disclose, however, that the reason that the named informant had been in contact with the police was because the police had been investigating domestic violence against her by the boyfriend, and that the informant was

---

evidence about defendant to the police, there was no evidence that he actually knew that Talbert was paying Van Meter to do so. Thus, although Van Meter was, in fact, providing information "for gain," we do not treat her as an informant in the first "category" listed in *Villagran.*

intoxicated when she made the statements concerning the defendant.

In *Culley*, we noted that, when an affidavit contains material omissions, "the court is to determine whether the omitted facts weaken the force of the facts recited or the inferences that would otherwise be reasonable to draw." *Id.* at 372-73 (citing *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001)). We went on to note that we defer to the findings of the trial court with respect to the facts pertinent to controversion, and that "the trial court found that [the named informant] had possible motives to falsify her report because she had been in an altercation with her boyfriend." *Culley*, 198 Or App at 374. We concluded that the named informant

"was not just a named citizen informant. She was, instead, a named informant who was intoxicated enough to impair her judgment and perceptions and who had a possible motive to falsify her report. Those facts draw into question the reliability and accuracy of [her] information. We therefore agree with the trial court that some corroboration of the information she gave to the police was needed."

*Id.* at 374-75.

Similarly in this case, there is a named informant, Van Meter, who had a motive to falsify her reports. Moreover, the discrepancies and other controverted details described above call into question "the reliability and accuracy" of the information that she provided. The more difficult question presented here is whether there was, in fact, sufficient corroboration of the information provided by Van Meter. Again, *Culley* informs our analysis. In *Culley*, we ultimately concluded that the named informant's information was not sufficiently corroborated:

"[M]uch of the information that police obtained from the hearsay sources consisted of information that defendant Robert Culley had sold drugs in the past from an apartment where he had been residing. Police did not know that defendants had moved to a residence on Hannan Lane until [the named informant] so informed them on the date that the affidavit was prepared. What [the named informant] told them, moreover, was limited. According to the

affidavit, [the named informant] said only that defendants had recently moved from the Azalea Reach Apartments to 'the residence on Hannan.' The affidavit does not suggest that [the named informant] gave police a specific address for that residence. Nor, according to the affidavit, did [the named informant] give police any description of the residence. As the trial court observed, according to the affidavit, the only fact that police corroborated after talking to Martin was that defendants had moved from the Azalea Reach Apartments. The affidavit did not recite any attempt by police to corroborate that defendants in fact had moved to a residence on Hannan Lane and to determine, if so, which one.

"[The named informant's] intoxication and her possible motive to falsify her report detracted from her inherent reliability as a named citizen informant. At a minimum, therefore, some corroboration that defendants had, as [the named informant] claimed, moved to an address on Hannan Lane was necessary to provide probable cause to believe that the search would discover things specified in the affidavit in the places requested to be searched. *Villagran*, 294 Or at 408. Without that corroboration, the affidavit failed to provide probable cause to believe that defendants were residing at the particular address (16009 Hannan Lane) to be searched and that drug activity was taking place there."

198 Or App at 375-76 (footnotes omitted).

In the present case, Rollins corroborated only two significant facts to support Van Meter's story. First, by visual inspection of the photographs provided by Talbert alleged to have been taken by Van Meter, Rollins was able to verify that the photographs were, in fact, of marijuana. Second, Rollins contacted the OMMP and determined that defendant's address was, in fact, a registered marijuana-growing site.

The most notable thing that is missing, however, is that Van Meter did not provide any information to Rollins indicating that she had observed marijuana plants *at the location Rollins knew to be defendant's residence*. That is, there is no indication that Van Meter told Rollins defendant's address or described any feature of the residence that Rollins was able to confirm or corroborate. Nor did Rollins

make any observations of the residence that would indicate that a marijuana-growing operation was occurring there. Although Rollins did discover that defendant's residence was registered with the OMMP as a marijuana-growing site, nothing in his affidavit corroborated Van Meter's story that defendant was actually growing marijuana there, much less unlawfully growing marijuana there. In light of the evidence adduced at the controversion hearing that Rollins' earlier investigation of defendant had involved a different address, the lack of corroboration that Van Meter had seen and photographed the marijuana plants *at defendant's residence* is significant. This lack of corroboration is particularly significant given Van Meter's failure to provide any description of the residence, and the controversion evidence that Van Meter had difficulty describing the physical features of the grow-room. The problem here is somewhat similar to the problem with the affidavit described in *Culley*—information provided by a named informant with a motive to falsify her report was not sufficiently corroborated by evidence connecting the alleged unlawful activity to the address to be searched.

In sum, the key features missing from the corroboration in this case are that *defendant* was the person growing the marijuana shown in the pictures, and that he was doing so at his residence. In light of the controverting facts introduced at the hearing revealing the bias of the named informant (that the affiant knew the informant was participating in a long-standing vendetta against defendant in conjunction with an undisclosed informant) and the problems with the information that she had provided to the affiant, we conclude that the lack of corroborating information connecting defendant, and defendant's address, to the evidence of the marijuana plants renders the affidavit, as controverted, insufficient to establish probable cause. Accordingly, the evidence discovered as a result of the warrant must be suppressed.

Reversed and remanded.